Good morning. My name is W.A. Griffin, both appellant and self-represented party. May I appease the Court? The District Court simply got it wrong when they held that the applicable The reason the District Court got it wrong is twofold. Number one, the District Court relied exclusively on this Court's holding in Harrison v. Digital Health Plan. Harrison can be found in West Law 1157098. The second reason the District Court got it wrong is because it failed to acknowledge the most recent Georgia Supreme Court holding in the State of Georgia v. Western Sky Financial. That case number is S16X1012, and that was in 2016. Because ERISA does not provide a statute of limitations for 29 U.S.C. 1132C, in Harrison, this Court affirmed with Georgia as the forum state that the statute of limitations for failure to provide a COBRA notice was most comparable to Georgia statute OCGA 9328. That statute reads, all actions by informers to recover any fine, forfeiture, or penalty shall be commenced within one year. Dr. Griffin, you think that the 20-year statute of limitations should apply? Yes, Your Honor, and I'll get into that later. However, the District Court failed to analyze the nature of the statutory violations for failure to provide a COBRA notice versus the nature of the violations here. In Harrison, failure to provide or mail a COBRA notice is considered a common law statute, whereas statute 1132C is predicated on the statutory obligation triggered by plaintiff's statutory rights to request planned documents. If the Court were to consider the nature of these violations, there is zero Eleventh Circuit case law that expressly states which state law should be barred to determine the statute of limitations for statutory penalties for failure to provide ERISA planned documents upon request. Because of this alone, this appellant feels as if the Court should disregard Harrison in full at this point. These statutory rights and obligations afforded by 1132C are considered consistent with the rights which arise under legislative enactment and which would not exist except for some act of legislature, which is why OCGA 9322, it gives you 20-year statute of limitations, is relevant and more appropriate statute of limitations. That statute states all of enforcement of rights accruing to individuals under statutes shall be brought within 20 years after the date of the action has occurred. Now the most relevant case law that talks about this and incorporates all of the elements in this case can be visualized in beautiful case law and the most recent holding in the State of Georgia v. Western Sky Financial. It's just a gorgeous case because it goes into detail about, the Court discusses in detail, informer actions and it talks about how informer actions originate as a sub-state of key time actions that subsequently evolve into two forms of statutory key time actions. One for informers who were not agreed and one for actual agreed parties who could sue for those statutory remedies. And being that I'm not a lawyer, I can kind of understand, just trying to fumble through that case, just from my understanding, there were a lot of changes with penalty claims, key time actions because back in the day there was a lot of litigation and there were vexatious litigants that took advantage of those statutes. And so over the course of years what happened was they started tightening it up, turning the key a little bit, and the Court's goal was to make it so those claims are not taken advantage of by vexatious litigants. And so that's one of the reasons why... I've got a different question I need to get you to before you run out of time. If I understand it, you got an assignment from the patients at the time of the service, but that didn't cover this kind of a claim, didn't give you the right to ask for documents. Later you got an assignment that you say relates back, that expressly says you have the right to ask for documents. Before you got that second assignment, that retroactive assignment, had the patient ever made a demand for documents from Aetna or Coventry? No, Your Honor. And since the time that you got that assignment, have you made a demand for the documents that's the subject of this case? Since the second assignment, no, Your Honor. No. So what did Coventry or Aetna do wrong? They said no to you at a point where you didn't have the right to ask for the documents. They've never said no to a proper demand for the documents. What are we doing here? I'm kind of confused on your question. There are about four patients that I received assignment of benefits on. And one of those patients, I did receive a planned document of some sort, patient TB from defendants. And additionally, the original assignment does state that this is assignment for benefits and for rights. However, it did not expressly state that those particular assignments were for statutory penalties. It did say benefits. But if you look at the docket and you look at the exhibits, you will see that throughout the course of appeals, the appeal letters, let it be known that that assignment, the original assignment was actually included or was intended to include statutory penalties and breaches of fiduciary duty as well. But that's not this case. We're in this case only on the assertion that the retroactive assignment created the right that we're dealing with. Isn't that right? Well, I guess yes and no. Yes and no. Basically, based on the contract law that I understand, the patient and I both agreed that the original assignment would be retroactive before the another assignment. And it was retroactively effective back to the original assignment. So in essence, I wanted to cure the defect that the defendants brought to the table. Does that make sense? I have it. The question was, what did Coventry or Aetna do wrong? And if they said no to a person who at the time had no right to ask for the documents, it seems to me they did nothing wrong. Well, Your Honor, if you look at the whole case, I mean, it's nothing but ERISA violations, failure to answer appeals, failure to turn over planned documents that determine how those claims were paid. There's something called rate tables and methodology that are planned documents that were never received. So in essence, and then on three of them, I got nothing. Three of the members, I didn't even get summary plan descriptions. So the bottom line is the defendants collected premiums, but they didn't honor ERISA law. They did not turn over summary plan descriptions. They did not turn over rate tables and methodology. And they didn't even turn over contracts that were requested repeatedly via certified mail. Dr. Wright, I think we got your point. You've saved some rebuttal time. Okay. You've saved rebuttal time. Yes, okay. Thank you. Mr. Tomlin. May it please the Court, Gary Tomlin on behalf of Aetna Health and Coventry Healthcare. This case is the second case filed by Dr. Griffin relating to these patients and treatment that occurred in 2012 and 2013. The first was dismissed by, at least the penalty claim was dismissed by Judge Totenberg because the assignment did not cover a right to proceed. Then Dr. Griffin got a retroactive assignment and refiled. We moved to dismiss on three grounds. First being that we're not the plan administrator, the employer is. Secondly, on this retroactive ground. And third, on the statute of limitations. Judge Totenberg ruled on the statute of limitations, but those other grounds are legal grounds that could be reached by this Court. Judge Tomlin, can I ask you a procedural question before you dive into the merits of your argument? Yes. Dr. Griffin, whether it was timely or proper or not, she made a request for documents in either late 2012 or early 2013, right, on behalf of one of the patients? Is that right? I believe that's correct, yes. Okay. Do you know whether there were any other requests for any of the other patients? I think she made requests for these five as outlined in the brief. I don't believe there were any subsequent requests either by the beneficiary or by Dr. Griffin. I thought she had made the request in 2012 or 2013 for some but not all, but you think it might have been all of them but then none after that? Correct. Okay. Thank you. And so the issue that was raised by Dr. Griffin is the statute, and if I might address that, the 29 U.S.C. 1132C provides for up to $100 a day penalty for failure to provide certain information to ERISA plan beneficiaries in a timely manner, including COBRA notices and other plan documents. They're all covered by the same penalty provision, and it's like a contempt provision. It is intended to coerce timely dissemination of information, and that purpose is critical in determining what's the appropriate statute of limitations. And, of course, the inquiry is, first, what is the State statute that is most closely analogous? This Court has already ruled on that issue under 1132C1 in the Harrison case, and that holding was reaffirmed in the Cumming case in the COBRA context, but still it's the same provision. And the Fourth Circuit has directly addressed the question, should there be any difference in the two, and in the Presley case cited at page 16 of our brief said no, that's the same. But part of the problem is that if you look at the text of the statute, and, of course, we have to borrow in a rough way because there's not much of a chance that a State statute of limitations provision is going to be based on the filing of ERISA claims. But here, the Georgia statute that you rely on and the district court relied on talks about claims by informers. Yes, Your Honor. Which the Georgia Supreme Court has now said are people who are like or a subset of QI-TAM relators. Dr. Griffin is not that, is she? Well, Your Honor, I think that in the Western Sky case, the Court did not address the much more closely analogous case of the Nunley case cited in our brief that was also reaffirmed in the Busbee case, where in the specific context of a claim that there was a failure to provide information in a timely way, in that case it was Western Union providing telegraph, that there was reason to read informer broadly in that context. And understand that Western Sky was a much different kind of statute, and I believe the holding is really applicable to that kind of statute, which was intended to prohibit completely the activity. And so there were — and the Court, in analyzing both the application of 9328 as well as the usury statute of limitations, looked at the — and said that the purpose was — was important in its inquiry just as the purpose is important to this Court's inquiry, because there isn't a statute of limitations in — in the payday lending statute. I think that the penal purpose and the coercive purpose of this statute is analogous to that Western Union one, and the — the court in the Nunley case said it would be absurd to apply a 20-year statute. It dealt with exactly this issue. Is it 20 years or one? It said it would be absurd to apply a 20-year in the context where the purpose of the statute is to get that timely compliance. And — and also that it would have perverse effects if you did that. Wouldn't it also be absurd to allow a 20-year statute of limitations for a usury claim? It would, and the Court did not — did not hold that. The Court — usury claims are still covered by a one-year statute. Payday is different. Payday is — is more than usury. It is abusiveness that the General Assembly intended to eradicate. And so I believe — and it has — it has both a compensatory and a penal aspect, to be sure. But — but I think the purpose there is to eradicate a kind of behavior, whereas — whereas here the purpose is to encourage timely dissemination of information. And so I would say the Western Sky opinion ought to be read in the context of what it — it is doing, and it did not overrule either Nunley or the more recent Busbee case, and it was — certainly was aware of that — of that construction. And — and those are limit — these are limited cases where you have an — a purpose to — to encourage timely action by the — by the actor, whether it be information or, in the Busbee case, it was timely payment of — of funds received by a county through fines and forfeitures. But it — it was to encourage that timely behavior. And — and I think, as the Nunley case clearly and — and correctly outlined, that to do otherwise would create perverse incentives, people sitting on their rights, as well as would lead for the possibility of harassing action by — But you can make that argument about anything that's covered by the 20 — I mean, a 20-year statute of limitations is a long statute of limitations. You can make that argument about almost anything that comes within that provision. But it's particularly apt, Your Honor, where there is a daily penalty. It is — the incentive, if you were to apply a — a 20-year statute, would be to sit on your rights for 19 years, particularly if it is a — a plaintiff who is a vexatious filer. And no circuit has, when faced with this, has — has held that a — a long — you know, a more-than-three-year statute applies. I think this has been addressed, you know, in the second, the third, the fourth, the eighth, have all held that statutes that are geared toward penalties and fines and forfeitures, somewhere between one and three years, were the applicable statutes. And — But that's because those analogous State statutes weren't limited to claims by and statutory rights and forfeitures and the like. Those are — those are pretty easy cases, it seems to me. This one, I think, is — is the same because of the Nunnally and Busbee cases. It said, in this context, Informer should be read more broadly because of the specific purpose. And — and, you know, Western Sky says — says what it says, but it says it in the — in a much different context. And I would ask the Court to consider that because the inquiry here is not which statute literally applies, but what is the most closely analogous. And I think in that regard, you can't ignore the — the Nunnally and Busbee cases, nor the purpose, nor the effect. And so to — to apply a 20-year rule in this context, I think, would be not only a break with — with the other circuits, but it would be — I think, frankly, there's a binding ruling in the Harrison and — and in the Cumming case that would — that would require an in-bank consideration. But I don't think there's justification for that here. I think that the policy reasons are — are firmly in — in favor of — of granting an affirmance here on the basis of it — 9328 being the most closely analogous. And — and I do think that in the alternative, this Court can — can address this case sufficiently by dealing with the undisputed evidence that we are not the plan administrator, that the employer is the plan sponsor, and the law is clear that, in that context, the — the plan sponsor is the administrator. And — and — and there is the — I'll acknowledge there is the concept of de facto administrator. That has been ruled to — to apply where the information duties are with the other party. How can we tell that, though, from the plan documents? Because we've cited it in — in our — in our brief. I mean, if someone's de facto, it's because it's not written, it's not mandated by the text of the plan. It just — that's the way it is. I think — I think not, Your Honor. I think that de facto in that context means there is none designated, and so then you have to look to see who in — who has the power of — of the — or the responsibilities consistent with the plan administrator. That's my understanding of it, but — and — and here the plans do give the responsibility to disseminate information to the — to the plan sponsor, the employer. We've cited the provisions in our brief. And then further, I think the retroactive assignment, as Judge Hinkle indicated to us, indicate — I mean, I don't think you can assign, but I think further the way this was done, there was not a valid request, and we — I don't believe we did anything wrong. Do we apply federal law or state law on the assignment issue? I believe this is a federal — it would be federal law would govern the rights under — under ERISA, but I believe that's correct. That's my understanding. That's my understanding of it, yes. I mean, I think, again, to the extent there's not federal common law, you would look to the — the state law for guidance, but I think ultimately that's a matter of federal law, quite frankly, as is the decision of — of what's most closely analogous. That is a federal decision, and — and what the statute is, is a federal — a matter of federal law where there would be incorporation of — of, obviously, the — the state statutes. But I think ultimately this is a federal question for the court. But I — I have it right that there was never a request by a person with authority to make the request that was denied. Yes, I believe that's correct, Your Honor. I think we have your case. Thank you. Dr. Griffin. Again, Your Honors. The Georgia Supreme Court expressly held that OCGA 9321 — I'm sorry, OCGA 9328 applied to actions of informers and that it did not apply to actions by aggrieved parties. Here, the fact pattern in this case clearly documents that the plaintiff is an aggrieved party and can be concluded that the 20-year statute of limitations applies. Unlike other states, Georgia stands out in that it is — it has a unique stance to protect the integrity of its citizens' statutory rights. The defendants talked about all the other case law where the statute of limitations is limited from anywhere from one to three years. However, the defendants failed to tell you that there are no other states like Georgia that actually have that particular statute. And that's the beauty of living in a state like Georgia. Georgia's tough on crime. So please, Your Honor, think about the impact that this would have on members, beneficiaries that have been mistreated by plan administrators such as Coventry and Aetna. This would be a statement because I can assure you if the court were to rule that the 20-year statute of limitations would apply, any citizen, member, beneficiary in the state of Georgia would probably have all planned documents within 24 hours that were requested if the court rules in my favor. Thank you. Thank you. We'll move to the next case, Monahab v. World Pay, U.S. We're talking about bringing in the ... Yes. Unfortunately. May it please the Court. Ms. Farahani. Yes. Farahani? Yes. Yes. May it please the Court. My name is Amanda Farahani, and I'm here on behalf of Susan Monahan, and I appear with Gail Coleman on behalf of the EEOC who will address the retaliation issues and the erroneous application of the severe or pervasive standard to retaliation. There are three issues that are before the court today. The first is whether a jury could find that a reasonable person would be dissuaded from raising complaints of discrimination if their manager berated them for it, including telling them that they are blackballed, their days are numbered, and that another employee is being trained for that position. In deciding this issue, the court must address whether a plaintiff can lose her right to a jury trial by being forced into a legal framework of the defendant's choosing under claims that she did not bring and that under law that is contrary to the Supreme Court of the United States and under an erroneous standard. Well, let's start with your comment that there are claims she didn't bring. The complaint doesn't allege a claim for retaliatory harassment or hostile work environment, right? Correct. It does not, Your Honor. So that claim should be out of the case. As I read the complaint, your claim was that the retaliation consisted essentially of her termination. Well, two issues. One was the conduct by Ms. Daniels, and then the second was her termination. And so first, Ms. Daniels was — Ms. Daniels retaliated against Ms. Monaghan by bringing her in, berating her, and that those actions itself constitute retaliation. The second portion of the retaliation claim is the retaliation that occurred when she was terminated. And so each of those were evaluated differently by the court, the first under the wrong standard, the second also erroneous. Well, I mean, my reading of what happened is this, and you can tell me if you think I have it right or wrong, and I'll ask your colleague the same thing. The magistrate judge believed or thought that Ms. Monaghan had alleged a claim for retaliation based on a retaliatory hostile environment-slash-harassment, addressed that claim, and then the parties addressed that claim, too, in different ways. And so it morphed into an independent claim, and then the magistrate judge and the district court ended up applying standards for that claim to what Ms. Monaghan had pled. So — Do I have it right or close to right? Very close to right, Your Honor. Yes, that was what the magistrate did. We objected that we had not brought a retaliatory harassment hostile work environment claim. We brought a retaliation claim. We did not bring anything under Galsky. Instead, what we brought was a retaliation claim that was based on two different sets of conduct. The first was Ms. Daniels' conduct, and the second was the conduct of being terminated. So when looking at the conduct for Ms. Daniels' termination — or Ms. Daniels' conduct, the question is whether what Ms. Daniels did was reasonably likely to persuade someone to not bring a claim of discrimination. And the district court said that the actions were highly inappropriate, but then took a severe or pervasive standard, applied it to that situation, which again is an erroneous standard. I'm not going to get into that standard too much as the EEOC will be addressing that. The second issue is whether the termination decision itself was erroneous in that whether the facts are so obvious and indisputable that the only remaining truly debatable matters are a legal question as to whether Ms. Harubula, when she told the plaintiff she was firing her for complaining, did not know that she was firing her for complaining about discrimination. And framing it in that way, it should be clear that that is, in fact, an issue of fact. And a reasonable jury could evaluate the evidence, use common sense and knowledge, and realize that in this situation, the facts there point to evidence that when the decision-maker told the plaintiff that because of her complaints, and plaintiff had made no complaints that did not include discrimination or retaliation, that the decision- Wait, wait, wait. No complaints that didn't involve prohibited discrimination? There's a written complaint, a memo in the file, the only thing written down, and it is true, isn't it? She did not submit that. There are documents in the file that say that, but the documents that contain information about her complaints are written by Mr. McGarricky and Mr. Hart. But her complaint, she wrote her complaint. So she did not have- Do I have that wrong? Those are notes that were submitted, but that was not a complaint that was written. Her complaints were verbal, and to the extent that she tried to provide a written complaint, she was told not to. She was also told not to include the discrimination in those. But the testimony, Your Honor, is- This memo I'm looking at ends, at the end, I rose and said, this is highly inappropriate and went back to my desk. This is her handwritten account of the meeting where she says she was berated. Yes, Your Honor. As is Document 7, Exhibit 7, as well as her handwritten account that goes through and explains in more detail everything that she did and said. Those were not provided to the defendant at the time. Those are after-the-fact documents that were provided in discovery. So how is it that when she wrote down her account of this, she didn't say one word about race, age, or anything prohibited? She was specifically told not to do that by Steve Karp, to not include information about the discrimination by also Mr. McGarrity. There are multiple people who told her that. But what's important here is that the testimony is that what she did is on each time that she went and orally complained, she included allegations of race and age or retaliation. And that's the testimony that the Court has to rely on here. Is there anything in the record that suggests that Ms. Daniel even knew that she had that Ms. Monahan had complained about the berating meeting? Yes, Your Honor. On page 164 of the plaintiff's deposition, she specifically identifies that Ms. Daniel said that she was berating her for complaining about discrimination. That doesn't say she knew about this meeting. That Ms. Daniels knew about? Right, about the meeting where Ms. Monahan says Ms. Daniels berated her. I couldn't find anything in the record suggesting that Ms. Daniels even knew that Ms. Monahan had ever complained about that meeting. Ms. Watkins, Your Honor, or Ms. Harubla? Ms. Daniels, whether Ms. Daniels knew that Ms. Monahan had complained about that meeting. Which meeting, Your Honor? The one that went on for an hour and 15 minutes, according to Ms. Monahan, and she ended up by saying this is highly inappropriate and went back to her desk. That meeting was with Ms. Daniels, Your Honor? Yes. The question is did Ms. Daniels know that Ms. Monahan had complained to up the chain about that? Yes, Your Honor. On page 164, Ms. Monahan says that Ms. Daniels told her that she was aware that Ms. Monahan had complained about discrimination. That's a different question, but I take your answer. All right. Thank you. I have one other question if I could take just a second. A question about the record. You say that the policies required Ms. Harubla to be involved in the actual decision. I couldn't find the policies in the record.  Your Honor, if they're not in the record, Ms. Watkins herself actually testified to that, that those policies are in effect, and also Ms. Watkins testified that she coached Ms. Harubla through the termination process and provided counseling to her, which according to Corbett v. Home Depot, which is directly on point and almost factually identical to this case, is sufficient to allow for a genuine issue of material fact for a jury on that issue of whether the decision-maker knew. Thank you. Thank you. Ms. Coleman. May it please the Court, Gail Coleman for the EEOC. Whether or not this Court reaches retaliatory harassment on the merits, it is critical for the Court to correct the legal error that Gowski controls the analysis. And this is the reason the EEOC is here today. The Supreme Court in Burlington held that retaliation is actionable even if the conduct does not violate the substantive anti-discrimination provision. And the reason for that is that the substantive provision and the anti-retaliation provision have different language and different purposes. The substantive provision speaks in terms of discrimination in terms or conditions of employment, and the anti-retaliation provision is not limited in this way. And the reason for that is because the effectiveness of the substantive provisions depends entirely on the willingness of employees to complain. For that reason, Burlington held that the anti-retaliation provision prohibits any action that might deter a reasonable employee from complaining. In Crawford v. Carroll, a case which is cited in the appellant's reply brief, this Court described the Burlington standard as, quote, decidedly more relaxed than the substantive standard. It said that the substantive standard and the retaliation standard are, and I quote, distinct and different. What do we do with Gus Gowsky? Well, exactly. That is the question. So Gowsky ignored both of these precedents. It ignored Burlington, which as a Supreme Court — It cited an Eighth Circuit case and a Sixth Circuit case, both of which relied on Burlington. No. Gowsky relied very heavily on a First Circuit case, which relied on pre-Burlington law. Well, that was pre-Burlington, but it cited two Burlington — post-Burlington cases. No, it — I'm talking about our — Gowsky did not — Our Court cited two post-Burlington cases, but did not pick up the test. Not in Gowsky. Gowsky simply assumed without citing to Burlington, no discussion of Burlington and no analysis of Burlington. Oh, I understand. But also, the jury instructions there were the severe or pervasive instructions. Both sides agreed to them, and that was the standard that went up. So when you're reviewing a case where the jury instructions were given that way and you're talking about whether the facts are sufficient, you really stuck with the jury instructions that both sides agreed to. Well, that may be the case, but then that would not make Gowsky a binding precedent on this issue. Really, the binding law is Burlington and Crawford v. Carroll under this own court's prior precedent rule. So again, I would urge this Court to — to recognize that Gowsky, whether for the reason that Judge Hinkle has just offered or for the reason that it was already bound by previous precedent, that Gowsky was wrong to the extent it has been interpreted as holding that the standard for retaliatory harassment differs from the standard for any other form of retaliation. Your position is that the adversity requirement for retaliation is the same no matter which form the retaliation takes, whether they are reprimands, decrease in salaries, harassment, et cetera. It's whether or not the action taken, if believed, would dissuade a reasonable employee or person from complaining about prohibited conduct. That's exactly right, Your Honor. There is nothing in Burlington or in Crawford that would justify any kind of carve-out for retaliatory harassment. So even if that harassment does not rise to the level of severe or pervasive conduct that would warrant a substantive discrimination claim, if it satisfies the Burlington standard, if it might deter a reasonable employee from complaining about discrimination, then it would still be actionable as retaliation. And if there Ms. Morrow. May it please the Court, I am Tracy Mower, counsel for WorldPay, Apelli WorldPay, Inc. Thank you this morning for this time. I will start first with the Burlington argument and note that it is in this circuit the controlling law has Benghazi v. Peek when it comes to retaliatory harassment claims. I will note also that the Court has noted that retaliatory harassment was not a claim that was alleged in plaintiff's complaint. The only reference that she had with respect to retaliation was What happened in this case is commonplace in this circuit. Pleadings start out, they're shifted to the magistrate judge, and one thing leads to another, and the complaint gets amended by the parties in their memos back and forth. Yes, sir. So, so. But here, Ms. Monahan, to Judge Choflat's point, Judge Monahan said that's not the claim we're pleading, right? Yes, in response to our motion for summary judgment. That is correct. She never tried to amend her complaint through the summary judgment posture. Whether her claim failed or succeeded, she said that's not the claim that we're traveling on. So shouldn't we just forget about it? If she's confirmed here today that that's not a claim she's traveling on, and you don't think it's an appropriate claim, why don't we just wipe that off of the face of the case and move on to the other issues? I completely agree, Your Honor. It should be gone. But there remains then her claim for other forms of what she claims are retaliation, right? Well, the only other form of retaliation that she claimed dealt with her termination, the termination of her employment. She claimed Ms. Daniels mistreated her. She claims Ms. Daniels mistreated her. So whatever you call that, you knew from the time the complaint was filed that part of what she was complaining about was that Ms. Daniels mistreated her, and partly that Ms. Daniels did it in retaliation for complaining about discrimination. She claims that Ms. Daniels in the October 2nd meeting, that that October 2nd meeting was retaliation for complaining about discrimination. We've noted in our brief that there was no claim for discrimination by Ms. Monaghan about Ms. Daniels. But even if we accepted her argument that she was being retaliated against by Ms. Daniels, there is still the requirement that she shows, and our anti-retaliation provisions require a showing that there was some sort of harm or injury. And even under Burlington, where the court has said that an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. When we look at the conduct that is alleged and is attributed to Ms. Daniels, there is nothing there that demonstrates that Ms. Monaghan was subjected to any conduct that would have dissuaded a reasonable worker from filing a claim. Burlington says that we are required to look at, if we're looking, traveling under Burlington, that we're required to look at what, required to look at the context of the case and the circumstances that particular matter. In this case, Ms. Monaghan alleged that she had not been trained by Ms. Daniel, for example. She says that, however, that that occurred in the first two weeks of her, first week of her employment before she alleged that there was any form of discriminatory conduct. Even with that, when you listen to what Ms. Monaghan had to say about the experience as compared to the temporary worker who came in a week later. She agreed it had nothing to do with her age, her race, and that she had not, at that point, had not made any complaints about Tammy. She complained that Tammy Daniel would not allow her overtime, but she also testified that she had not followed the proper procedures and that Tammy told her that the problem with giving her the overtime was because she had not talked with Tammy. Tammy had no idea what the overtime was for. She had not covered that in advance with Ms. Daniel. She complained that, or at least her other conduct that she attributes to Tammy, concerns whether Ms. Daniel said and told the temporary contract worker that I am training you for Susan's job, for Ms. Monaghan's job. And, again, when we look at the record, number one, the contract worker says that never happened. But number two, Ms. Daniel never did anything about it. I mean, it's basically bark and no bite of the conduct that she attributes to Ms. Daniel. She goes on to say and alleges that she was repeatedly threatened and that physical threats of harm came to her, but the fact of the matter is that didn't happen. You say that didn't happen, but she testified that it did. At summary judgment, how can you make that assertion? She testified that Ms. Daniel said, watch it, and she testified that Ms. Daniel said, I know where you and my boyfriend and I know where you live. She never testified as to what those meant. She never asked what those meant. What do you think a reasonable person would take that to mean? In the context of this case? Yes. Yeah, I don't, I don't, there's nothing to suggest that Ms. Daniel was going after her. Ms. Monaghan testified. That's an inference you want to draw, but I'm not sure it's the only inference. Well, Ms. Monaghan testified that she was not afraid of Ms. Daniel. She testified that she didn't believe that Ms. Daniel was going to do anything to her. The point is not whether or not an employee subjectively becomes afraid, but whether or not the conduct, the alleged conduct by an employer or supervisor would dissuade a reasonable person from complaining. You don't think there's any of that in this case? I don't, because she did, in fact, complain. No, no, that's a different question. I understand what you're saying. That's a different question. I'm assuming a complaint. I know you've got arguments about that. About what she complained. Yes, there's a different, you know, the analysis proceeds in different steps. She has to make a complaint about prohibited conduct, or at least have a reasonable belief that she's complaining about that. And then there has to be action that is deemed retaliatory. I'm talking about that second step, the retaliatory part. You don't think that anything that Ms. Daniels did, according to Ms. Under Burlington Northern. Not even under Burlington Northern, including the cases that were cited by plaintiffs, because they don't, you know, Burlington Northern also requires that there be some level of materiality to the complaints that are being made or the challenged conduct that's being brought forward. And when you look at those cases, there was something material that actually happened in those cases. In Davis v. Florida Agency for Health Administration, for example, the plaintiff was given an unfavorable performance evaluation after she filed a grievance with HR. Daniel provided no unfavorable performance reviews in this case, for example. In Corbett v. Home Depot, there were two supervisors where the evidence was clear that there were retaliatory motives that influenced and they participated in a group decision to terminate plaintiffs after they supported a retaliation claim. And Daniel had nothing to do with that. I mean, she had nothing to do with termination. She was already gone. She did not leave anything in Ms. Monaghan's personnel file about her. She didn't have discussions with anyone about Ms. Monaghan going forward that would have had some impact into the future on Ms. Monaghan. When did Ms. Daniels leave compared to Ms. Monaghan's termination? She left about two weeks before Ms. Monaghan left, but that was a decision that had been made prior to that. What do we do on the third point about Ms. Hralba's statement, alleged statement that she told Ms. Monaghan that she was being terminated for complaining? We, I say we disregarded the statement, but I understand. How can you disregard it? You can't disregard it. It may not have probative value. It may be legally irrelevant. It may be legally insufficient, but you can't disregard it. She's the one who, according to you, made the termination decision for Ms. Monaghan, right? That is correct. So she's the decision maker, according to you. She is the decision maker. So what she says is relevant. It may be legally insufficient, but whatever she says is certainly relevant. Right, Your Honor. And we did argue that she, what the comment that Ms. Monaghan attributed. What do we do with it? What do you do with that statement? What do we do with the statement? Well, we look at the statement for, you know, plaintiff argued that it was direct evidence of retaliation, and you look at the nature and character of the statement and say, what do we know about this? When we look in the record, Ms. Harubula said that what she knew about complaining was that Ms. Monaghan complained about her workload. Mr. McGarrigle testified that she complained about the workload. So I think it's reasonable to state that, based on the record and the fact that Ms. Monaghan herself said that she has never complained to Ms. Harubula, to April Watkins, the head of HR, the president of the company or HR itself about alleged discrimination, that it is a reasonable inference from the record that Ms. Harubula was not making a comment about discrimination. There is no evidence in the record that any other person had a conversation with Ms. Harubula about alleged discriminatory complaints from Ms. Monaghan. So I think the record is enough to be able to say that when you look at it as a whole, the reasonable inference is that Ms. Harubula did not have sufficient information. In fact, she had no information that Ms. Monaghan had made complaints of discrimination when she made the termination decision. I take it one of the proper legitimate non-retaliatory reasons for the complainer. She did a lot of complaining. She's got this single-spaced memo complaining about all manner of things, just not about discrimination. But not about discrimination. That is correct. And she says that she wanted to provide her complaint to Mr. McGarrigle or Mr. Karp. And, again, she testified that that was the document that she intended to give them. And she also testified and acknowledged that there's nothing on that document that alleges age or race discrimination. So on that point, with respect to her discharge, WorldPay respectfully submits that the district court properly affirmed summary judgment or properly provided summary judgment. And we respectfully ask that that be affirmed as well. Plaintiff mentioned that, and I think that this court has already spoken on as recently as June of this year in the Jefferson v. that summary judgment does not violate the Seventh Amendment. And summary judgment in employment cases can be appropriate and is appropriate where there are no disputed genuine facts. And that is the case here as well. We believe that is a closed issue, although it was certainly argued by appellant in this matter. Also, we'll note that plaintiff argued regarding interested parties and reams, and this court has consistently held that these conclusory allegations without specific supporting facts have no probative value. And that goes back, again, I think, to the Harubula discussion. And also with regard to the Harubula discussion, this court in Clover made sure Clover also indicated and was clear that just because people in a corporation may have discussions does not mean that they talk about a specific issue. Similarly, in Brungard v. Bell South Telecommunications, the fact that an employer is a corporation does not relieve a plaintiff of the burden of showing a causal connection between the protected conduct and the decision to take adverse action. The question is that their argument is that she could have been told, Ms. Harubula, about this. The question is, was she told, and the record does not provide us any evidence of that. Thank you, Your Honor. Thank you. Thank you. Your Honor, you asked the question, what do we do with the statement that she was fired because she was complaining? And, Your Honor, the answer to that is you let the jury decide what that statement means. Yes, there are reasonable inferences that could be taken on the facts of this case against the plaintiff, but that's a jury decision to make, whether the reasonable inferences that the defendant asserts are the ones that the jury decides or the ones that we assert are the ones that the jury should decide. Tell me the complaints that were made in good faith taking into account the law of the circuit that even a vile racial epithet is not sufficiently hostile to be actionable and that because the law on that is settled, a complaint, even about a vile racial epithet, does not constitute a good faith protected complaint. Well, Your Honor, the Jefferson case shows that it need not go that far in order for there to be a good faith underlying belief that there is a reasonable claim. My question was really, well, you may be turning to it, my question was for help with the record. What were the complaints that you say were protected? Yes. So she complained on four separate occasions. On each of those occasions that she complained, she raised issues that she specifically said were race and age discriminatory comments, including the comments about the Suntan comment, the white girls. Okay. So the Suntan remark can't possibly be as bad as directly using the N-word. Correct. And yet the law of the circuit is that's not protected, right? Yes, Your Honor. All right. And the you white girls get me, that's the same thing. That's not nearly as bad as the racial epithet. True? True, Your Honor. All right. So that's two of the four. What are the other two? Right, Your Honor. If we parse each one of them out individually, then we can easily say each one on their own is not something that is recoverable. But in a case where you've got multiple instances that are happening over a period of time and multiple complaints that are being brought forward to multiple people, then we have to look at the context of what's happened in order to make a decision about whether there's a reasonable underlying good faith belief. Before you move on, what were the other two? The other two were – wow, I just threw a blank. The other two were based on the screaming and yelling. So it was the retaliatory comments telling her that she was going to cut her throat, that this was because of her age, telling her that she was too old, telling her she didn't fit in. There were comments about her clothing, dressing like an old lady, about food that she ate. And throughout every one of the comments that she's made, yes, there were complaints that she also brought about work-related issues. But the testimony in the case is that every single time that she came forward with a complaint, that part of her complaint included claims of age and race discrimination, using the words discrimination, using the words that she believed that she was being harassed. Who did she make those complaints to? What is the best testimony or evidence in the record that she told somebody at word play, I'm being discriminated on the basis of either race or age? There are multiple parts of the plaintiff's testimony where she said she told Bernie McGargle, where she told Steve Carp, where she also was talking to Lucas, where Patty Newcomer, another management individual, was there, that they raised those issues forward to the executive branch, and that then Ms. Daniel came to her and said, you have been complaining to me about me about discrimination. Then you turn to what the knowledge would be that Ms. Harubla knew, and you look at the context again. Yes, Ms. Harubla herself says that she didn't know anything, but you don't have to believe her for the purposes of summary judgment, and instead you look at the context. And the context in this case shows that Ms. Watkins was involved and Ms. O'Neill was involved all the way throughout. Thank you, Your Honors. Thank you.